IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:16-cr-00016-02-TMB-KFM |
| Plaintiff, | |
| vs. | **FINAL REPORT AND RECOMMENDATION REGARDING THIRD MOTION TO SUPPRESS**[1] **[Docket No. 39]** |
| JAFARI LEWIS-DANIEL, | |
| Defendant. | |

## I.  MOTION PRESENTED

Before the Court is Jafari Lewis-Daniel's motion to suppress evidence of statements he gave to the FBI on February 9, 2016.[2]  The government opposes.[3]  No party asked for an evidentiary hearing or for argument, and this Court concludes that neither is required.  Upon careful consideration of all the circumstances surrounding the FBI questioning of Jafari[4] on February 9, 2016, this Court recommends that the District Court, upon independent review, deny the motion to suppress at Docket No. 39.

---

[1]  This report and recommendation is being issued as a final report and recommendation.  Pursuant to Fed. R. Crim. P. 59(b)(3), any objections will be considered by the District Court Judge, who will accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration and recommendations.

[2]  Docket No. 39.

[3]  Docket No. 49.

[4]  This report and recommendation refers to Jafari Lewis-Daniel as Jafari to avoid any confusion with co-defendant Jarron Ezekiah Lewis-Daniel.

## II. BACKGROUND

### A. The Indictment

Jafari Lewis-Daniel and Jarron Ezekiah Lewis-Daniel jointly are charged with armed bank robbery in violation of 18 U.S.C. § 2113(a), (d) (Count 1).[5] The Indictment alleges that on December 23, 2015, they stole $230,050 belonging to the Wells Fargo Bank by force, violence, and intimidation with a firearm.[6] The Indictment also seeks forfeiture of $97,888, a 55 inch big screen television, 99 percent pure gold foiled playing cards, a 2010 Honda motorcycle, a 2003 Dodge truck, and 2005 Audi A4 automobile if either is convicted of the armed bank robbery.[7]

### B. Jafari Lewis-Daniel's Motion to Suppress and the Government's Response

Jafari asks for an order suppressing statements he gave to law enforcement on February 9, 2016.[8] Jafari contends that his statements must be suppressed because they were obtained in violation of the Fifth and Sixth Amendments.[9] In particular, Jafari asserts that he invoked his right to counsel during an interview with Special Agent Wendy Terry, and that all statements to law enforcement following his invocation must be suppressed under *Edwards v. Arizona*.[10] Jafari's motion is supported by the sworn declaration from his counsel attesting to the truthfulness of the factual representations contained in his suppression request.[11]

The government opposes.[12] It contends that the *Edwards* rule was not violated because Jafari was never in *Miranda* custody when he voluntarily responded to FBI questions.[13]

---

[5] Docket No. 9.
[6] *Id.*
[7] *Id.*
[8] Docket No. 39 at 1.
[9] *Id.*
[10] 451 U.S. 477 (1981).
[11] Docket No. 40.
[12] Docket No. 49.
[13] *Id.* at 8-12.

The government's opposition is supported by the sworn declaration of Special Agent Wendy Terry, which attests to the circumstances surrounding the February 9, 2016, FBI questioning of Jafari.[14] The government's opposition is supplemented with a conventionally filed CD which contains recordings of Jafari's February 9, 2016 interviews with law enforcement.[15]

## C.      Jafari's Response to the Order from Chambers

In response to this Court's minute order,[16] Jafari clarified his suppression request.[17] In particular, Jafari indicated he: (1) does not contend that he was in custody during his February 9, 2016 interviews with Special Agent Terry; (2) does not contest the veracity of Special Agent Terry's sworn declaration; and (3) was not requesting an evidentiary hearing on whether he was in *Miranda* custody during the February 9, 2016 interview with Special Agent Terry.[18]

## D.      The Facts

On December 23, 2015, an Axiom armored car was robbed outside a Wells Fargo Bank in Anchorage, Alaska.[19] The robbers made off with $230,050, money which belonged to the bank.[20] On February 9, 2016, at approximately 6:40 a.m., eleven law enforcement agents executed a robbery investigation-related search warrant on Jafari's apartment.[21] The officers knocked on Jafari's door and announced their presence.[22] When no one responded after a minute, the officers used a battering ram to break down the door.[23] The officers then ordered Jafari, his girlfriend, and

---

[14] Docket No. 50.
[15] Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews).
[16] Docket No. 56.
[17] Docket No. 57.
[18] *Id.*
[19] Docket Nos. 1 at 6; 50 at ¶ 2.
[20] Docket No. 1 at 6.
[21] Docket No. 50 at ¶¶ 3, 4.
[22] *Id.* at ¶ 4.
[23] *Id.* at ¶ 5.

another female resident out of the apartment.[24]  The three were held briefly in a hallway immediately outside the apartment while the officers cleared it to ensure that no one was hiding or destroying evidence.[25]

Once the apartment was cleared, Jafari and the two women returned to the apartment.[26]  Jafari sat on a couch.[27]  FBI Special Agent Wendy Terry introduced herself, described the warrant authorizing the search, and asked if Jafari wanted to speak with her.[28]  Terry told Jafari that if he agreed to speak with her the conversation could occur in the apartment, in a car outside the apartment, or at the FBI office.[29]  She specifically informed Jafari that he need not submit to an interview and that he could leave at any time.[30]

Jafari said he would speak with Terry in the car.[31]  After February-appropriate clothing was located, Jafari accompanied Terry and Special Agent Daryl Allison to a nearby government sport utility vehicle.[32]  Jafari was not handcuffed.[33]  Terry sat in the rear driver's side seat across from Jafari.[34]  Jafari sat in the rear passenger-side seat across from Terry.[35]  Allison sat in the front in the driver's seat.[36]  A ninety-minute recorded interview followed. [37]  Fourteen minutes into the interview the following colloquy occurred:

> **SA Terry:** Everybody talks and this is your opportunity to tell me what happened okay?  It's really important that we continue

---

[24] *Id.*
[25] *Id.* at ¶ 6.
[26] *Id.* at ¶ 7.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.* at ¶¶ 7, 10.
[31] *Id.* at ¶ 7.
[32] *Id.* at ¶¶ 7, 8.
[33] *Id.* at ¶ 7.
[34] *Id.* at ¶ 8.
[35] *Id.*
[36] *Id.*
[37] *Id.* at ¶ 9; *see also* Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews).

this conversation that you're upfront with me, tell me exactly what happened, how it happened and your side of the story cause this is pretty much the only chance you get to do that. After today, I'm not going to talk to you anymore. And all these other people have already started flipping because everybody talks man, you know that, everybody talks so don't be the last person to talk cause when you're the last person to talk, --- we see it all the time, you know people think they're gonna beat it and then they'll go "no no I'm not gonna say anything" and then eventually they go to jail and they'll go "oh shit I wanna talk" and I'm like it's too late now, cause everyone's already made their deals okay? So obviously we're here because, I mean I'm not sure why you used the car that was registered in your name but

> **Jafari:** I didn't use anything

> **SA Terry:** I gotcha, ok. Let's get past, so let's start, so let's take little baby steps okay. First step is, let's get past you not being involved. I know you are involved, I didn't come to ask you if you were involved, I know you are okay? And we're not gonna play semantics of "I wasn't in the car, I didn't hold the gun." I wanna know exactly from you what happened and how it happened from beginning to end. Because you don't want any of these other jokers telling your story because when they tell your story it's gonna make you look really bad.

> **Jafari:** They can tell their story all they want ma'am.

> **SA Terry:** I understand but

> **Jafari:** But what comes out of my mouth is what's from my heart. And I can tell you straight up that I was not there when it happened, that was my vehicle and that was it. **But further than that, I would like to have a lawyer present.**

> **SA Terry:** Okay

> **Jafari:** Because, you know, but that part about my uncle that was not a lie so

> **SA Terry:** Oh no, I don't

> **Jafari:** Just so you know

> **SA Terry:** No no I have no idea whether he's your uncle or not. I know that

**Jafari:** Yeah of course, I just want to put that out there

**SA Terry:** Okay, that's cool I mean

**Jafari:** Because that was not a lie – you can talk to him, call him whatever. Cause he's

**SA Allison:** Will he pick up the phone?

**SA Terry:** Yeah

**Jafari:** I don't know

**SA Terry:** Probably not

**SA Allison:** He probably won't pick up the phone because he doesn't know who we are

**SA Terry:** Yeah probably not. Okay I gotcha

**Jafari:** But yeah, I did get that truck for 12

**SA Terry:** Yeah

**Jafari:** And yeah

**SA Terry:** You know, I mean it's up to you what you gonna do but if what you're saying is true then all you have to do is just tell me what they told you and you would be, probably better off, well at least better off than them. So let's just start with that. Who actually borrowed the car.[38]

During the interview, Jafari made incriminating statements. He denied involvement in the robbery, but admitted loaning his car to the robbers and receiving $40,000, apparently in return for the loan of the car.[39]

---

[38] Docket No. 39 at 2-5 (emphasis added); *see also* Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews).

[39] Docket No. 50 at ¶ 9; *see also* Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews) at Exhibit 2 – First Interview.

The first interview ended when Terry left the sport utility vehicle to check on the status of the search and to get a copy of the search warrant.[40] When she returned, Jafari still was sitting in the vehicle with Allison.[41] Terry again activated her recording device and told Jafari that the search was still underway, that copies of the warrant were in his apartment, that he was not under arrest, and that he was free to leave.[42] Terry provided Jafari with a business card so he could contact her if he wanted to provide any additional information about the case.[43] This conversation lasted about three minutes.[44]

Jafari got out of the sport utility vehicle and returned to his apartment.[45] Terry and Allison accompanied Jafari to the apartment and obtained a chair for him to sit on in the outside hallway while the search continued inside.[46] As he waited, the searching officers discovered a handgun and a bag containing $18,400 on the ground outside Jafari's third floor apartment window.[47] When Terry asked about the handgun, Jafari said he found it at a party and that he tossed it out the window when he heard the FBI knock.[48] This recorded conversation lasted about six minutes.[49] Again, Terry advised Jafari that he could not return to his apartment until the search was completed, but that he was not under arrest and was free to leave at any time.[50] Jafari remained

---

[40] Docket No. 50 at ¶ 10.
[41] *Id.*
[42] *Id.; see also* Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interview) at Exhibit 3 – Second Interview.
[43] Docket No. 50 at ¶ 10.
[44] *Id.*
[45] *Id.* at ¶ 11.
[46] *Id.*
[47] *Id.*
[48] *Id.; see also* Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interview) at Exhibit 4 – Third Interview.
[49] *Id.*
[50] Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews) at Exhibit 4 – Third Interview.

seated in the hallway near his apartment. After this conversation, Terry left to interview Jarron Lewis-Daniel at a different location.[51]

After Terry left, Special Agent Ormberg and Task Force Officer Clark interviewed Jafari.[52] This interview occurred in a vehicle and was recorded on a video recorder.[53] At the outset, Ormberg advised Jafari that he was free to leave, but gave him a *Miranda* warning "based on some of the stuff we found in the house."[54] Jafari acknowledged his rights and expressly agreed to speak with Ormberg and Troy.[55] During this interview, Ormberg and Troy used incriminating statements Jafari earlier gave to Terry to formulate their own questions.[56] Jafari's responses continued to be incriminating.[57] When this questioning ended an hour or so later, these officers arrested Jafari and charged him with armed bank robbery.

### III. ISSUE PRESENTED

Did the FBI obtain Jafari's statements in violation of the Fifth and Sixth Amendments as explicated in *Edwards v. Arizona*?

### IV. ANALYSIS

Upon a careful and through examination of FBI questioning of Jafari on February 9, 2016, this Court respectfully recommends that the District Court, upon independent review, deny the motion to suppress at Docket No. 39. This result is compelled because Jafari's statements were entirely free and voluntary, and because he was never in *Miranda* custody during his conversations

---

[51] Docket No. 50 at ¶ 13.
[52] *Id.*
[53] Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interviews) at Exhibits 5a, 5b – Fourth Interview.
[54] Docket No. 55 (conventionally filed CD of February 9, 2016 recorded interview) at Exhibits 5a, 5b. The video recording appears incomplete. However, Exhibit 5a captures the *Miranda* advisement and Jafari's waiver.
[55] *Id.*
[56] *Id.*
[57] *Id.*

with Special Agent Terry. The result also is compelled because the Sixth Amendment right to counsel had not attached; the formal charging process had not yet been initiated.

## A. The Fifth Amendment and the *Edwards* Rule

In *Miranda v. Arizona,*[58] the Supreme Court has determined that custodial interrogation is inherently coercive.[59] To protect the individual subjected to custodial interrogation, the Court has directed law enforcement to advise the individual of his or her rights to silence and to counsel before questioning can begin.[60] In *Edwards v. Arizona,*[61] the Supreme Court ruled that all custodial questioning must cease whenever the person unequivocally asserts his or her Fifth Amendment right to counsel.[62] Indeed, questioning may continue only after counsel has been provided or the person, having received the *Miranda* advisement, initiates further communication with law enforcement.[63] The right to counsel during custodial interrogation is grounded in the Constitution[64] and is implicated whenever the person is said to be in *Miranda* custody.[65] Conversely, the *Edwards* rule does not apply when the person is not in *Miranda* custody.[66] Thus, un-coerced, free, and voluntarily responses to police questioning do not violate the *Edwards* rule, even after a desire for counsel is expressed, when the person is not in *Miranda* custody.

---

[58] 384 U.S. 436 (1966).
[59] *New York v. Quarles*, 467 U.S. 649, 654 (1984) (citing *Miranda,* 484 U.S. at 460-61, 467).
[60] *Id.*
[61] 451 U.S. 477 (1981).
[62] *Id.* at 484-85.
[63] *Id.*
[64] *Dickerson v. United States,* 530 U.S. 428, 444 (2000).
[65] *See, e.g., Howes v. Fields,* 132 S. Ct. 1181, 1189 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.").
[66] *Cf. United States v. Hines,* 963 F.2d 255, 256 (9th Cir. 1992) (per curiam) ("It is well established . . . that the Fifth Amendment right to counsel under *Miranda* does not vest until a defendant is taken into custody.").

The Supreme Court has defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way."[67]  The *Miranda* test for custody is objective.[68] Evaluation of a *Miranda* custody claim requires:  (1) an inquiry into the circumstances surrounding the interrogation; and (2) a determination of whether a reasonable person in those circumstances would have felt free to terminate the interrogation and leave.[69]  The ultimate inquiry "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."[70]  Courts must weigh all of the circumstances surrounding the interrogation and decide how a reasonable person in the defendant's position would perceive his or her circumstances.[71]  The subjective views of the interrogating officer or the person being questioned do not control.[72]  Factors to be considered include the location of the questioning,[73] the duration of the questioning,[74] statements made during the interview,[75] the presence or absence of physical restraints during the questioning,[76] and the release of the interviewee at the end of the interview.[77]

In the present case, Jafari submitted to three audio recorded non-*Mirandized* interviews with Terry and Allison and one video recorded *Mirandized* interview with Ormberg

---

[67] *Miranda,* 384 U.S. at 444.
[68] *Yarborough v. Alvarado,* 541 U.S. 652, 663 (2004) (quoting *Stansbury v. California,* 511 U.S. 318, 323 (1994) (per curiam)).
[69] *Thompson v. Keohane,* 516 U.S. 99, 112 (1995).
[70] *Yarborough,* 541 U.S. at 662 (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983) (per curiam)).
[71] *Id.* at 663 (citing *Stansbury,* 511 U.S. at 322).
[72] *Id.* (citing *Stansbury,* 511 U.S. at 323).
[73] *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012).
[74] *Id.*
[75] *Id.*
[76] *Id.*
[77] *Id.*

and Clark.[78]  The Court has listened to the recordings in their entirety and nothing occurred during the various interviews that would cause a reasonable person in Jafari's position to conclude that he could not terminate the interview and leave.

At the outset of each interview, including the final *Mirandized* interview, the officers expressly told Jafari that he was free to leave at any time and that he was under no obligation to answer any questions.  Each interview was conversational in tone and, while the interviewing officers were sometimes skeptical of Jafari's answers, their demeanor and questioning throughout was respectful and polite.  Jafari was never restrained at any time during the interviews.  Indeed, the only limitation placed on him was the prohibition that he not return to the apartment during the search.  Even then, the officers secured a chair for him to sit in while he waited in the hallway for the search to be completed.  All of these facts mitigate against a *Miranda* custody determination.  The interviews were not lengthy and, in any event, Jafari elected to remain at the scene for the duration of the search.

The only factor that weighs in favor of a *Miranda* custody determination is the fact that Jafari was arrested at the conclusion of the interview with Ormberg and Clark.  But there is nothing about that fact to suggest that Jafari was in *Miranda* custody at any time during his conversations with Terry and Allison.  Under these circumstances, this Court readily concludes that Jafari was not in *Miranda* custody and, for that reason, the *Edwards* rule does not apply.

---

[78] *See supra* n.54.

**B.     The Sixth Amendment Right to Counsel has No Application**

Jafari, without briefing or citation to authority, also grounds his right to counsel suppression claim in the Sixth Amendment.[79]  But *Edwards* is not a Sixth Amendment case.[80] More importantly, the Sixth Amendment right to counsel does not attach until "at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[81]  Thus, in this case there is no basis for Sixth Amendment claim because, at the time of the interviews, formal charges had not been initiated against Jafari.  Accordingly, the Sixth Amendment does not provide a basis for barring admission of Jafari's statements.[82]

## V.   CONCLUSION

Based on the foregoing analysis, this Court respectfully recommends that the District Court, upon independent review, **deny the motion to suppress at Docket No. 39.**

DATED this 14th day of July, 2016, at Anchorage, Alaska.

/s/ Kevin F. McCoy
Kevin F. McCoy
United States Magistrate Judge

Pursuant to Fed. R. Crim. P. 59(b)(2)  and  D. Alaska Loc. Mag. R. 6(a), a party seeking to object to this final finding and recommendation shall file written objections with the Clerk of Court no later than the **CLOSE OF BUSINESS** on **July 28, 2016**.  Pursuant to Fed. R. Crim. P. 59(b)(3), objections will be considered first by the District Court Judge, who will then accept, reject, or modify the recommendation, or resubmit the matter to the Magistrate Judge for additional consideration.  Failure to object to a magistrate judge's findings of fact may be treated

---

[79]  Docket No. 39 at 1.
[80]  *Edwards,* 451 U.S. at 480 n.7 ("We thus need not decide Edwards' claim that the State deprived him of his right to counsel under the Sixth Amendment . . . [because] the Sixth Amendment right to counsel arises whenever an accused has been indicted or adversary criminal proceedings have otherwise begun[.]").
[81]  *United States v. Harrison,* 213 F.3d 1206, 1209 (9th Cir. 2000) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689 (1972)).
[82]  *McNeil v. Wisconsin,* 501 U.S. 171, 175-76 (1991).

as a procedural default and waiver of the right to contest those findings on appeal. *Miranda v. Anchondo, et al.*, 684 F.3d 844 (9th Cir. 2012). The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation. *United States v. Howell*, 231 F.3d 615 (9th Cir. 2000). Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers. Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support. Response(s) to the objections shall be filed on or before the **CLOSE OF BUSINESS** on **August 4, 2016**. The parties shall otherwise comply with provisions of D. Alaska Loc. Mag. R. 6(a).

Reports and recommendations are not appealable orders. Any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment. *See Hilliard v. Kincheloe*, 796 F.2d 308 (9th Cir. 1986).